No. 91-443

IN THE SUPREME COURT OF THE STATE OF MONTANA

1992

STATE OF MONTANA,

Plaintiff and Respondent,

-vs-

RICHARD J. FERTTERER, SR., and
DAVID JOHN FERTTERER,

Defendants and Appellants.

APPEAL FROM: District Court of the Eighth Judicial District,
In and for the County of Cascade,
The Honorable Joel G. Roth, Judge presiding.

COUNSEL OF RECORD:

For Appellants:

John M. Morrison argued, Morrison Law Offices,
Helena, Montana

For Respondent:

Hon. Marc Racicot, Attorney General, Helena, Montana
Paul D. Johnson argued, Assistant Attorney General,
Helena, Montana
Patrick L. Paul, Cascade County Attorney, Great
Falls, Montana
Steve Hagerman, Deputy Cascade County Attorney,
Great Falls, Montana

FILED

SEP 2 8 1992

Filed *Ed Smith*
CLERK OF SUPREME COURT
STATE OF MONTANA

Submitted: July 9, 1992

Decided: September 28, 1992

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

A jury in the Eighth Judicial District Court, Cascade County, Montana, convicted Richard J. Fertterer, Sr. of seven misdemeanor fish and game violations and two counts of felony criminal mischief. This jury also found David John Fertterer guilty of four misdemeanor fish and game violations and two counts of felony criminal mischief. Defendants appeal the felony convictions and the sentence imposed by the District Court. We affirm in part and reverse in part.

The Fertterers raise the following issues for our review:

1. Are wild animals "public property" within the purview of § 45-6-101, MCA?

2. Does Title 87, MCA, provide an exclusive remedy for the illegal taking of game?

3. Are wild animals property within the definition of § 45-2-101(54), MCA?

4. Is Montana's criminal mischief statute, as applied to the Fertterers, unconstitutionally vague?

5. Did the District Court properly charge the Fertterers with the costs of investigation?

6. Did the District Court properly charge Fertterers with jury costs?

From November 1989, through August 1990, the Department of Fish Wildlife and Parks (FWP) conducted an undercover investigation of a large scale poaching operation run by the Fertterers. During the investigation FWP agents, posing as out-of-state hunters, had

2

extensive contact with the defendants. At trial, agents testified they were actively guided by the Fertterers during two separate five-day hunts. Neither defendant had an outfitter license. In addition, agents testified that during those hunts, Fertterers were spotlighting and killing game without proper tags, illegally trapping bear, soliciting the sale of an illegally killed mountain lion hide, and attempting to sell approximately 1000 pounds of deer and elk meat to an Illinois FWP agent posing as an owner of a meat market.

The jury convicted Richard Fertterer of two counts of felony criminal mischief for illegally killing three elk, six deer and three antelope. It also convicted him of several misdemeanors under Title 87, MCA, including: two counts of outfitting without a license; two counts of unlawfully selling, transporting and possessing game; two counts of hunting with aid of artificial light; and one count of unlawfully trapping game animals.

Likewise, the jury convicted David John Fertterer of two counts of felony criminal mischief for unlawfully killing one mountain lion and three elk. He was also convicted of several misdemeanors under Title 87, MCA, including: guiding without a license, unlawful sale or possession of game, hunting with aid of artificial light, and unlawful trapping of game animals.

Fertterers contend they were wrongfully convicted of felony criminal mischief where wild animals are not properly classified as property or public property within Montana's criminal code. In the alternative defendants claim the criminal mischief statute is

3

unconstitutionally vague as applied to Fertterers and violates the legislative intent of Title 87, MCA.

As a condition of the Fertterers' partially suspended sentences, the District Court charged both defendants with the cost of the jury trial, investigation expenses incurred by FWP, and restitution for the value of the wild game they illegally killed. Defendants argue the court improperly charged them with jury costs where the state improperly tried and convicted them of criminal mischief, and that the costs were excessive due to the length of the trial and the change of venue caused by the State's excessive publicizing of the case. Finally they contend the court wrongfully charged them with investigative costs incurred by FWP prior to filing an information.

I

Are wild animals "public property" within the meaning of § 45-6-101, MCA?

Section 45-6-101(1)(a), MCA, provides:

(1) A person commits the offense of criminal mischief if he knowingly or purposely:
(a) injures, damages, or destroys any property of another or public property without consent; . . .

In this instance, defendants contend the District Court incorrectly instructed the jury that wild animals in Montana are owned by the State and are public property. Fertterers argue that the State has no title ownership in the wild animals within its borders; thus, the animals are not owned by the State.

Although the criminal code fails to define "public property", it offers some other definitions regarding ownership which are

4

helpful in defining "public property" under Montana's criminal code.

Section 45-2-101(46), MCA, defines owner as follows:

"Owner" means a person other than the offender who has possession of or any other interest in the property involved, even though such interest or possession is unlawful, and without whose consent the offender has no authority to exert control over the property.

Under this definition, ownership is not limited to title ownership such as that applied to the ownership of real property or to personal property such as cattle or other livestock. The statute recognizes that a lesser interest than title ownership is sufficient as an ownership interest in property crimes.

In State v. Tome (1987), 228 Mont. 398, 742 P.2d 479, this Court recognized that an interest less than title ownership was sufficient to prove ownership for the purpose of Montana's criminal mischief statute. Tome, 228 Mont. at 401, 742 P.2d at 481. In that case, the defendant was charged with felony criminal mischief for $191 in vandalism damages to a city building and $359 in damages to a vending machine leased by a golf pro employed by the city. The defendant argued that the lower court incorrectly considered $359 in damages to the machine in convicting him of felony criminal mischief. This Court held that mere possessory ownership is sufficient to show ownership under the criminal mischief statute.

Similarly here, the State need not prove it had title ownership interest in wild game within its borders. As stated in §45-2-101(46), MCA, the State is an owner of the property if,

5

without the State's consent, the Fertterers had no authority to exert control over the game.

Next § 45-2-101(55), MCA, defines property of another as follows:

"Property of another" means real or personal property in which a person other than the offender has an interest which the offender has no authority to defeat or impair, even though the offender himself may have an interest in the property.

Again, this definition focuses not on title ownership of the property but on a superior interest. Under this definition, the State need only prove that it had an interest in the wild game which the Fertterers had no authority to either defeat or impair. Once again under the definition of § 45-2-101(55), MCA, the State need not prove it has title ownership to the game to be classified as an owner.

While the criminal code does not require the State to prove title ownership, the State must prove it possesses an interest superior to the interest of the Fertterers. We conclude that under the statutes and cases of Montana, the State has a superior interest under the ownership theory and also has such an interest by virtue of its police power to regulate the taking of game.

A brief historical analysis shows that beginning with Geer v. Connecticut (1896), 161 U.S. 519, the United States Supreme Court recognized that the states had a right to regulate the taking of game within their borders. This regulatory power was derived from the states' "title ownership" in the game, and also from the states' police power. In Geer, the Court determined that a

6

Connecticut law prohibiting the taking of game birds outside its borders did not violate interstate commerce. That court likewise relied on the title ownership theory in subsequent federal cases including Baldwin v. Montana (1978), 436 U.S. 371. In Baldwin, the Court recognized Montana's interest in regulating the taking and preserving the game animals within its borders. It held that Montana's disparate licensing fees between resident hunters and non-resident hunters did not violate the privileges and immunities clause of the Constitution or the equal protection clause. In the 1979 case of Hughes v. Oklahoma (1979), 441 U.S. 322, the United States Supreme Court concluded that an Oklahoma law which prohibited the transporting of live minnows across state lines into Texas violated the interstate commerce clause. As a part of that opinion, it expressly abandoned the title ownership theory as promulgated in Geer. The defendants argue that the Hughes decision effectively precludes Montana from convicting them of criminal mischief for destroying public property.

The State contends there are no federal constitutional questions of interstate commerce, equal protection, or privileges and immunities; and as a result, Hughes is not controlling. We agree with that contention. There is no federal constitutional issue or other federal question presented in the present case. As a result, the holding in Hughes is not controlling here. We do point out that as we compare Hughes to Baldwin, we are not certain the holding expressed in this case would be found to contradict Hughes.

7

Montana has long recognized that Montana has the power to regulate game animals under both a title ownership and police power theory. In Rosenfeld v. Jakways (1923), 67 Mont. 558, 216 P. 776, this Court stated the rule very clearly as follows:

> That the <u>ownership of wild animals is in the state, held by it in its sovereign capacity for the use and benefit of the people</u> generally, and that neither such animals nor parts thereof are subject to private ownership except in so far as the state may choose to make them so, are principles now too firmly established to be open to controversy. (Geer v. Connecticut, 161 U.S. 519, 40 L.Ed. 793, 16 Sup.Ct.Rep. 600, [See, also, Rose's U.S Notes]; 12 R.C.L. 691-703.) If the state so elects it may prohibit absolutely the killing of such animals, or it may regulate the killing and prohibit the sale in this state of such animals or the parts, whether the animals were killed within or without the state. It may grant or withhold the right to hunt, and if it grants the right at all it may do so upon such terms and conditions as it sees fit to impose so long as constitutional limitations or guaranties are not infringed. <u>Aside from any question of common ownership, the state may exercise these rights in virtue of its police power.</u> There is practically not any dissent from these general propositions. (Emphasis supplied.)

The State's ownership in wild game for the use and benefit of its people was affirmed in Heiser v. Severy (1945), 117 Mont. 105, 158 P.2d 501, and again in State ex rel. Visser v. State Fish and Game Comm'n (1968), 150 Mont. 525, 437 P.2d 373. In <u>Visser</u>, this Court confirmed the State's ownership of wild game and its authority to regulate private ownership of game as long as those regulations do not violate the Constitution.

Montana's case law affirming the State's property interest in wild game is consistent with case law from other jurisdictions, including Washington, Colorado, Oregon, Indiana, Texas, Michigan and Alabama. In State v. Gillette (Wash. 1980), 621 P.2d 764,

8

Washington sued and recovered damages from property owners whose reconstruction of a stream bank resulted in the killing of salmon. That court concluded that Washington had standing to sue. It held: "food fish of the state are the sole property of the people of the state . . ." Likewise in Collopy v. Wildlife Comm'n (Colo. 1981), 625 P.2d 994, that court upheld a regulation prohibiting hunting within a specific area. The court recognized that the ownership of wild game is in the state for the benefit of all the people. Finally, in Rogers v. State (Ala.App. 1985), 491 So.2d 987, that court stated: "The authority of the state to regulate hunting . . . derives from the long established and well recognized principle of law that ownership of wild animals is vested in the state." See also, Ridenour v. Furness (Ind.App. 1987), 504 N.E.2d 336; Wiley v. Baker (Tex.App. 1980), 597 S.W.2d 3; and Glave v. Michigan Terminix Co. (Mich.App. 1987), 407 N.W.2d 36.

In accordance with the above cited Montana cases, and consistent also with Baldwin, we hold that Montana has an ownership interest in wild game held by it in its sovereign capacity for the use and benefit of the people. We further hold that under its police powers, which extend to such wild game, the State may prohibit the killing of wild game and regulate the killing of the same. We hold that wild animals are public property within the meaning of Montana's criminal mischief statute, and that Montana's interest in such public property is superior to the interest of the Fertterers.

9

Does Title 87, MCA, provide an exclusive remedy for the illegal taking of game?

First, Fertterers contend the State cannot charge them under Title 45 where Title 87 provides a more specific definition of the conduct. The State contends that the prosecutor has the discretion to charge under any statute. We agree with the State. This Court most recently affirmed the prosecutor's discretion to charge in State v. Brady (1991), 249 Mont. 290, 816 P.2d 413. In Brady the defendant claimed he should have been charged under the more specific crime of domestic abuse rather than aggravated kidnapping. We affirmed the conviction and upheld the prosecutor's discretion to charge any offense as long as the defendant's conduct meets the elements of the crime. As in Brady, here we conclude that the prosecutor had the discretion to charge the Fertterers under Title 45, Montana's criminal code.

Next, Fertterers contend that charging them with felony criminal mischief circumvents the will of the legislature. Defendant's further claim the result, a felony conviction in District Court, is manifestly unjust where Title 87, MCA, only exposes them to misdemeanor penalties. The State contends that Title 87, MCA, does not provide an exclusive remedy, thus Fertterers' felony convictions were a proper result. Section 87-1-102, MCA (1989), provides in pertinent part:

> (1) A person violating any provision of this title, any other state law pertaining to fish and game, or the orders or rules of the commission or department is, unless a different punishment is expressly provided by

law for the violation, guilty of a misdemeanor . . . . (Emphasis supplied.)

We affirm the conclusion of the District Court and resulting felony convictions. In this case a "different punishment" had been expressly provided in Title 45, MCA. We further conclude that none of the sections of Title 87 comprehensively define the Fertterers' conduct. We conclude the legislature did not intend the misdemeanor provisions of Title 87 to constitute the exclusive punishments for fish and game violations.

We hold Title 87, MCA, does not provide an exclusive remedy for the illegal taking of game.

## III

Are wild animals property within the definition of § 45-2-101(54), MCA?

Fertterers contend wild animals are not property within the definition of § 45-2-101(54), MCA. Section 45-2-101(54)(h), MCA, defines property as: "any tangible or intangible thing of value. . . . Property includes but is not limited to: birds, animals, and fish which ordinarily are kept in a state of confinement; . . ." [Emphasis added.] Although Fertterers agree this is a non-exclusive list, they argue that by including domestic animals in the category, the legislature clearly intended to exclude wild game from the definition of property. Once again, we disagree with the defendants. We conclude that property under this section is defined broadly enough to include wild game.

Fertterers further argue that wild animals are not public property within the meaning of § 70-1-104, MCA, and § 70-2-111,

11

MCA. We conclude definitions of Title 70, MCA, are not controlling in Montana's criminal code. We hold that wild animals are property within the definition of § 45-2-101(54), MCA.

IV

Is Montana's criminal mischief statute, as applied to the Fertterers, unconstitutionally vague?

Fertterers contend that the criminal mischief statute, as applied, is unconstitutionally vague and violates due process. Fertterers cite two Ninth Circuit cases defining vagueness. First, a statute is void for vagueness if it fails to give a person of ordinary intelligence notice of the illegal conduct. United States v. Dupree (9th Cir. 1976), 544 F.2d 1050, 1051. Next they cite United States v. Stenberg (9th Cir. 1986), 803 F.2d 422, which held that statutes must apply explicit standards to avoid arbitrary and discriminatory applications. In essence, Fertterers argue that although they knowingly violated misdemeanor statutes under Title 87, MCA, they were not provided sufficient notice that their conduct violated Montana's criminal mischief statute. We do not find this argument compelling.

As stated previously, wild animals are public property within the meaning of § 45-6-101, MCA, and the definitions in Title 45, MCA, provide sufficient notice that wild animals are public property within the criminal code. Thus, reasonable persons would have realized that the conduct of destroying wild animals without the consent of the State, specifically violated § 45-6-101(1)(a), MCA. Further, Montana's criminal mischief statute applies explicit

standards which prevent arbitrary and discriminatory application.

We hold that the criminal mischief statute as applied to the Fertterers does not violate due process.

V

Did the District Court properly charge the Fertterers with the costs of investigation?

Section 46-18-232(1), MCA, provides:

A court may require a convicted defendant in a felony or misdemeanor case to pay costs, as defined in 25-10-201, plus costs of jury service as part of his sentence. Such costs shall be limited to expenses specifically incurred by the prosecution in connection with the proceedings against the defendant.

Section 25-10-201, MCA, specifies costs generally allowable. That section does not include investigative costs incurred prior to the State's filing of an information.

Although this is a case of first impression in Montana, this Court has held that in civil cases, statutory authority must exist in order for the district court to award costs. Masanovich v. School Dist. No. 1 (1978), 178 Mont. 138, 582 P.2d 1234. Oregon has not allowed the state to recover costs of police investigations incurred prior to the filing of the information. State v. Haynes (Or.App. 1981), 633 P.2d 38. We adopt the holding in Haynes and conclude the District Court improperly charged the Fertterers with the investigative costs expended prior to the filing of the information.

Oregon has recognized an exception to that general rule. As stated in State v. Pettit (Or.App. 1985), 698 P.2d 1049, Oregon allowed the state to recover money paid directly to the defendants

13

as part of an undercover drug investigation as restitution. The State argues in the present case that under the restitution theory of Pettit it should be allowed to recover cash amounts paid by the State to the Fertterers through its undercover agents.

We likewise approve of the Pettit exception to Haynes and conclude that here restitution is appropriate under the Pettit analysis. We further conclude that such restitution should be limited to amount paid directly to the Fertterers for guided hunts and for meat and animal parts purchased in the undercover investigation. We remand to the District Court in order that it may determine the extent of the restitution to be allowed to the State under this theory.

VI

Did the District Court properly charge Fertterers with jury costs?

The pertinent statute on the issue of payment of costs by a defendant is § 46-18-232, which in pertinent part provides:

> **Payment of costs by defendant.** (1) A court may require a convicted defendant in a felony or misdemeanor case to pay costs, as defined in 25-10-201, plus costs of jury service as a part of his sentence. Such costs shall be limited to expenses specifically incurred by the prosecution in connection with the proceedings against the defendant.
> (2) The court may not sentence a defendant to pay costs unless the defendant is or will be able to pay them. In determining the amount and method of payment of costs, the court shall take into account the financial resources of the defendant and the nature of the burden that payment of costs will impose.
> (3) A defendant who has been sentenced to pay costs and who is not in default in the payment thereof may at any time petition the court that sentenced him for remission of the payment of costs or of any unpaid portion thereof. If it appears to the satisfaction of

14

the court that payment of the amount due will impose manifest hardship on the defendant or his immediate family, the court may remit all or part of the amount due in costs. . . . (Emphasis added.)

In two different cases the constitutionality of the foregoing statute has been upheld against claims of a violation of due process rights under the Constitution. State v. Weinberger (1983), 204 Mont. 278, 306, 665 P.2d 202, 217; State v. Pease (1987), 227 Mont. 424, 434, 740 P.2d 659, 665.

The primary argument on the part of the defendants is that the due process rights of the defendants were denied when they were required to pay costs attended to a change of venue where pretrial publicity requiring the change was created and encouraged by the State. Defendants urge this Court to adopt a rule which would not allow costs to be awarded where the State was primarily responsible for extensive pretrial publicity.

As pointed out by the State, the record does not contain any evidence to support the contention that the State was primarily responsible for pretrial publicity and the State vigorously contests such factual assertions. The State properly points out that no motion concerning this issue was made to the District Court and no hearing was requested on this issue in the District Court. As a result, there are no findings and conclusions of the District Court for this Court to review, nor is there any hearing record containing testimony from witnesses. We conclude that the State is correct that the assertion that the State somehow caused the extensive pretrial publicity is not sufficient to raise an issue on

15

the matter of jury costs. As a result we will not consider this for the first time on appeal.

We conclude that the plain and unambiguous language of § 46-18-232, MCA, establishes that the District Court properly assessed all costs associated with jury service.

We hold the District Court properly charged Fertterers with jury costs.

The District Court is affirmed with the exception of our remand for recalculation of restitution under Part V.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

16

Justice Karla M. Gray concurring in part and dissenting in part.

I concur in that portion of the majority opinion which reverses the District Court's charging of investigation costs to the Fertterers. It is my view that issues numbered one, three and four by the majority need not be reached. I dissent from the majority opinion on issue two as stated. In addition, I would restate that issue as whether the Fertterers properly could be charged with felony fish and game violations under the law in effect at the time and hold that such charges clearly are precluded by § 87-1-102(1), MCA (1989). I also dissent on the issue of imposing on the Fertterers the increased jury costs associated with change of venue.

The majority states issue two as whether Title 87, MCA, provides an exclusive remedy for the illegal taking of game. I conclude that, with only specific exceptions, it does.

Title 87 constitutes the legislature's enactment of a comprehensive statutory body of law regarding fishing, hunting and trapping in Montana. It ranges from simple licensing requirements to criminal penalties for certain activities relating to fish and game. One need look no further than the majority's tortured construction of § 45-6-101, MCA, to see that rendering that statute applicable to the illegal taking of game was never within the contemplation or intent of the Montana legislature.

It is true that § 87-1-102(1), MCA (1989), references "any other state law pertaining to fish and game. . . . " Given the

17

common understanding of "pertaining" as "having reference to" (Webster's Ninth New Collegiate Dictionary), the reasonable interpretation of that language is that other laws specifically referring to fish and game may be located elsewhere in the Montana Code Annotated. Indeed, a close review of Title 87 indicates that such other laws pertaining to fish and game do exist. Section 87-1-102(4), MCA (1989), for example, refers to Title 37, chapter 47. That chapter of Title 37 addresses outfitters and guides and, therefore, contains other state law pertaining to fish and game. There is simply nothing reasonable about an interpretation which construes the "any other state law pertaining to fish and game," language in § 87-1-102(1), MCA (1989), to mean "any other state law on any subject which the Montana Supreme Court can bend, mold or strain into covering a fish and game violation;" yet that is the effect of the majority's opinion in this case.

In addition, the majority concedes that the violations at issue here--that is, the felony charges--are fish and game violations without regard to where in the Montana Code the statutory basis for those violations is found. Even if one accepted the majority's interpretation of § 45-6-101, MCA, it was improper to charge the Fertterers with felony fish and game offenses under the law in effect at the time.

Section 87-1-102, MCA (1989), addresses penalties and punishments for fish and game violations. A person violating Montana's fish and game laws "is, unless a different punishment is

18

expressly provided by law for the violation, guilty of a misdemeanor and shall be fined not less than $50 or more than $500, imprisoned in the county jail for not more than 6 months, or both." Misled, perhaps, by the unartful drafting of the statute, the majority focuses in on the "different punishment" language, dismisses the misdemeanor designation and fails to place the statute into context with those which follow.

Criminal offenses in Montana are classified or designated as misdemeanors or felonies for purposes of jurisdiction and statutes of limitations; the designation is based upon the maximum potential sentence which could be imposed for the offense. Section 45-1-201, MCA (1989). All criminal offenses must be designated as misdemeanors or felonies. Id.

Section 87-1-102(1), MCA (1989), provides that all fish and game violations, wherever in Montana law the offense may be found, are misdemeanors. This clear statement of intent by the Montana legislature is simply ignored by the majority.

The majority relies on "unless a different punishment is expressly provided by law" language in § 87-1-102(1), MCA (1989), to reach its conclusion that the Fertterers were properly charged with _felony_ fish and game violations. It reasons that the placement of that clause _prior_ to both the misdemeanor designation and the penalty provisions which follow it reflects legislative intent to provide for felony fish and game offenses. This analysis is flawed, given the clear misdemeanor designation.

19

Notwithstanding the inappropriate placement of the "different punishment" language, it is clear that the clause was intended to modify the other penalty/punishment language in § 87-1-102(1), MCA (1989), and not the misdemeanor designation itself.

This intent is particularly clear by reading §§ 87-1-102 and 87-1-111, MCA (1989), (Temporary), together. Section 87-1-102(1), MCA (1989), provides that all fish and game violations are misdemeanors and that, unless otherwise expressly provided, the penalty for fish and game misdemeanors is a fine of between $50 and $500, imprisonment in the county jail for not more than six months, or both.

Subsection (2) of § 87-1-102, MCA (1989), and § 87-1-111, MCA (1989), (Temporary), "expressly provide" for different penalties for certain fish and game misdemeanors. Section 87-1-102(2), MCA (1989), provides for increased fines; § 87-1-111, MCA (1989), (Temporary), provides for restitution in addition to the statutory fines and county jail terms. Neither of these statutes, however, impose a criminal penalty outside the range available for misdemeanors. See § 45-2-101(36) and (21), MCA (1989). Indeed, they merely provide for implementation of the "different punishment" language contained in § 87-1-102, MCA (1989). Absent statutory amendment to the clear statement that all fish and game violations are misdemeanors, no felony designations or punishments are authorized.

The soundness of this interpretation and analysis is best

20

illustrated by a brief review of 1991 legislative action regarding fish and game violations. First, the 1991 legislature passed Senate Bill 240 as Chapter 277, Laws of 1991. The title of Senate Bill 240 begins "An Act to generally revise the law regarding fish and game misdemeanor penalties;". This is a clear reflection of the fact that, at that time, all fish and game violations were misdemeanors. Indeed, Section 2 of Senate Bill 240 restructures § 87-1-102, MCA (1989), by placing the "different punishment" language after the specific punishments provided; as suggested above, this was always the intended meaning of the "different punishment" language. Importantly, Section 2 also inserted the language "except if a felony is expressly provided by law;" again, this is a clear statement by the legislature that, until its 1991 action, all fish and game violations were misdemeanors.

The 1991 legislature then proceeded to create specific felony fish and game violations. It did so via Senate Bill 239, enacted as Chapter 329, Laws of 1991. The title of that bill begins "An Act establishing as felonies the sale of unlawfully taken wildlife and the possession of unlawfully taken wildlife having a value of more than $1,000;" (emphasis added). These are, of course, the very offenses committed by the Fertterers. A clearer statement of legislative intent to convert such offenses from misdemeanors to felonies hardly can be imagined.

In sum, it is my view that the Fertterers improperly were charged with felony offenses. I would reverse the felony

21

convictions.

I would also reverse the District Court's imposition of the jury costs associated with the change of venue. While I have serious reservations about the entire notion of assessing the costs associated with asserting the constitutional right to a jury trial against a convicted defendant, those fundamental questions about this Court's Weinberger and Pease decisions can await another day. In upholding the assessment of such costs, absent an inability to pay, this Court stated in Weinberger that "Montana's statute does no more than deprive 'a financially able defendant of available funds which, in fairness, should be remitted to the public coffers.'" Weinberger, 204 Mont. 278 at 306 (citations omitted). In this case, application of the statute does much more.

Here, the District Court stated that "there is a great likelihood that prejudice exists so that the Defendants could not receive a fair trial from an unprejudiced and impartial jury" in Cascade County. It exercised its discretion to grant defendants' motion "in order to assure a fair trial." Because of the location in Cascade County of the extensive physical evidence to be offered at trial, the court determined that, "as a practical matter," it was better to bring in a jury from Kalispell than to transfer the case to another county where a fair trial could be held. If the latter option had been utilized, the usual "costs of jury service" contemplated by § 46-18-232(1), MCA, would have been incurred and assessed.

22

Surely it offends every notion of fair play, if not due process, to penalize these defendants for their inability to obtain a fair trial in Cascade County. Just as surely it offends such notions where the District Court chose one option rather than the other, under § 46-13-204, MCA, in ensuring a fair trial and the significantly increased expense of that option, according to the majority, can be imposed on the Fertterers. I cannot agree.

_____
Justice

Justice Terry N. Trieweiler joins in the foregoing concurring and dissenting opinion of Justice Karla M. Gray.

_____
Justice

Justice William E. Hunt, Sr. joins in the foregoing concurring and dissenting opinion of Justice Karla M. Gray.

_____
Justice

23

September 28, 1992

## CERTIFICATE OF SERVICE

I hereby certify that the following order was sent by United States mail, prepaid, to the following named:


Frank B. Morrison, Jr. and John M. Morrison
Morrison Law Offices
80 So. Warren
Helena, MT  59601

Hon. Marc Racicot, Attorney General
Paul D. Johnson, Asst. Atty. General
Justice Bldg.
Helena, MT  59620

Patrick L. Paul, County Attorney
Steve Hagerman, Deputy
Cascade County Courthouse
Great Falls, MT  59401

ED SMITH
CLERK OF THE SUPREME COURT
STATE OF MONTANA

BY:_____
   Deputy
